Citation Nr: 1229622 
Decision Date: 08/28/12 Archive Date: 09/05/12

DOCKET NO. 11-02 725 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Nashville, Tennessee


THE ISSUES

1. Entitlement to service connection for polymyalgia rheumatica, to include as due to an undiagnosed illness.

2. Entitlement to service connection for peripheral neuropathy of the upper extremities, to include as due to an undiagnosed illness.

3. Entitlement to service connection for peripheral neuropathy of the lower extremities, to include as due to an undiagnosed illness.


REPRESENTATION

Appellant represented by: Christine A. Coronado, Attorney at Law


WITNESS AT HEARING ON APPEAL

The Veteran
ATTORNEY FOR THE BOARD

Michael Holincheck, Counsel


INTRODUCTION

The Veteran served on active duty from January 1991 to June 1991. He had additional service in the Tennessee Army National Guard from December 1979 to February 1992.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from June 2009 and October 2009 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Nashville, Tennessee.

The Veteran testified before the undersigned Veterans Law Judge at a videoconference hearing in April 2012. A transcript of the hearing is associated with the claims file. The hearing record was kept open for 30 days to allow the Veteran time to submit additional evidence. The Veteran submitted additional argument and new medical evidence that was received at the Board in May 2012. The Veteran did not waive consideration of the evidence by the agency of original jurisdiction (AOJ). However, as the Veteran's case is being remanded, the AOJ will then have an opportunity to review the evidence in the first instance. 

The Veteran also raised new issues at the time of his hearing in April 2012. He was encouraged at that time to present a claim for the new issues at the RO. The Board notes that the Veteran raised claims for service connection for insomnia, headaches, skin rash, irritable bowel syndrome, and chronic fatigue syndrome. Those issues have not yet developed or adjudicated and are therefore referred to the AOJ for appropriate action.

The appeal is REMANDED to the RO. VA will notify the Veteran if further action is required. 

REMAND

The Veteran served in the Tennessee Army National Guard from December 1979 to February 1992. He also served on active duty in support of Operation Desert Storm from January 1991 to June 1991. [He served in Southwest Asia for almost the entire period of active duty.] 

The Veteran submitted his claim for service connection for what he identified as a blood disease and undefined neuropathy in June 2008. He reported that his blood disease began in February 2008 and his neuropathy in May 2008. He relates his claimed disabilities to his period of active duty in 1991. He has not alleged that they are related to any period of National Guard duty. He maintains that his claimed disabilities are due to environmental exposures or mandated vaccinations.

The Veteran may establish entitlement to service connection on a direct basis or as a result of statutory and regulatory provisions relating to compensation for certain disabilities due to undiagnosed illnesses. 38 U.S.C.A. §§ 1110, 1117 (West 2002); 38 C.F.R. §§ 3.303, 3.317.

The Board notes that the RO cited to the July 2002 version of 38 C.F.R. § 3.317 in the statement of the case (SOC) issued to the Veteran in December 2010. This was not the version of the regulation in effect at the time of the Veteran's claim in June 2008. The version in effect then was actually promulgated in June 2003, effective from March 1, 2002. See 68 Fed. Reg. 34,539-543 (June 10, 2003). There have been only minor changes prior to the date of the claim to extend the delimiting date by which such undiagnosed illness must become manifest. 

In adjudicating claims involving an undiagnosed illness, the term "medically unexplained chronic multi-symptom illness" is defined to mean "a diagnosed illness without conclusive pathophysiology or etiology, that is characterized by overlapping symptoms and signs and has features such as fatigue, pain, disability out of proportion to physical findings, and inconsistent demonstration of laboratory abnormalities." Further chronic multi-symptom illnesses of partially understood etiology and pathophysiology will not be considered medically unexplained. 38 C.F.R. § 3.317(a)(2)(ii) (2011). As of the date of the claim, VA had identified three illnesses as a medically unexplained chronic multi-symptom illness chronic fatigue syndrome, fibromyalgia, and irritable bowel syndrome (IBS). 38 C.F.R. § 3.317(a)(2)(i)(B)(1) through (3) (2011). 

The Board notes that the applicable regulation, 38 C.F.R. § 3.317, underwent an extensive revision in September 2010. The change was effective September 29, 2010, and applied to all applications for benefits pending before VA on, or received by VA on or after, September 29, 2010. See 75 Fed. Reg. 59,968-59,972 (Sept. 29, 2010). One area of note was that the amended regulation added a new subsection for consideration of presumptive service connection for infectious disease. 38 C.F.R. § 3.317(c) (2011). 

The regulation underwent a second change in July 2011, effective from August 15, 2011, with the change applicable to all claims pending before, filed with or remanded to VA on or after August 15, 2011. See 76 Fed. Reg. 41,696-41,698 (July 15, 2011). Paragraph (a)(2)(i)(B)(3) was changed by removing IBS and adding Functional gastrointestinal disorders (excluding structural gastrointestinal diseases). A new note to the paragraph was also added to "clarify concepts involving medically unexplained chronic multisymptom illnesses that comprise FGID [functional gastrointestinal disorders] and facilitate understanding of information to diagnosis of such disorders." 76 Fed. Reg. 41,697. 

On remand, if the benefit sought is not granted, the RO must include the version of the regulation applicable at the time of the claim in June 2008 as well as the amended regulation from September 2010 and August 2011 in any supplemental statement of the case (SSOC) that is issued. 

Additionally, the RO wrote to the Veteran to provide him with notice on how to substantiate his claim in June 2008. The letter also asked that the Veteran either provide, or identify, sources of medical treatment for his claimed conditions. 

The RO made attempts to obtain the Veteran's service treatment records (STRs) but was unsuccessful. The Veteran was informed of this development.
The Veteran submitted several statements, as well as statements from two individuals who served with him in Southwest Asia, in regard to exposure to smoke from the oil fires. They also reported receiving an Anthrax vaccination.

The Veteran has not provided an authorization for VA to obtain private medical records in this case. He submitted several treatment entries from D. Guthrie, M.D., for the period from April 2008 to July 2008. The initial visit was on April 7, 2008. The Veteran reported symptoms of tingling in his legs and not feeling right for about 2 1/2 weeks. The discomfort had moved around and was in his upper arms some and neck. It was noted that he had recent laboratory work done that revealed an elevated sedimentation (SED) rate. The impression at that time was of fatigue, headache, and arthralgias. Dr. Guthrie said he could not rule out the possibility of a tick bite or some type of environmental exposure that could be responsible for the Veteran's symptoms. Another record from that date noted that the Veteran had an appointment with P. Siosin, M.D. for April 24 but that this was changed to April 15.

On April 11, 2008, Dr. Guthrie noted that the Veteran was to see Dr. Sioson, described as an infectious disease doctor. He said the Veteran's main complaint was fatigue. No neuropathy was noted. On May 13, 2008, Dr. Guthrie said the Veteran was acting like he may have polymyalgia rheumatica (PMR). It was noted that a rheumatologist's opinion was going to be obtained. The Veteran was noted to describe a feeling of having worms crawling under his skin, arms, and anterior chest at night. In the impressions Dr. Guthrie noted arthralgias, muscle aches, and PMR by diagnosis of Dr. Sioson and fatigue. In July 2008, Dr. Guthrie indicated he needed to get the notes from the rheumatologist, Dr. Aelion. 

The Veteran responded to the RO's letter in September 2008. In addition to the lay statements from service comrades, he provided a journal that detailed his eating habits on certain days as well as other events, to include medical visits. He listed the onset of pain in his leg in February 2008. He thought that it was related to prior back surgery and sought chiropractic care until he began to see Dr. Guthrie in April 2008. He listed being seen in a Family Practice Clinic before seeing Dr. Guthrie. The Veteran described having an electromyography (EMG) test in an entry dated April 16, 2008, with a Dr. Curwen. He also listed evaluation by Dr. P. Sioson and Dr. J. Aelion. The latter physician was also involved in the Veteran being hospitalized in regard to his experiencing acute and temporary blindness. 

Associated with the claims folder is a VA record entry of a Persian Gulf War examination done in September 2008. The entry noted the Veteran's claimed exposures during his service in Southwest Asia. The entry said the Veteran was being treated for neuropathy of his legs and arms with an unknown etiology. The examiner noted that he had reviewed the Veteran's treatment journal for ongoing treatment of PMR and said that a temporal artery biopsy was negative for PMR. However, there was a clinical diagnosis of the condition. The examiner also referenced a progress note from Dr. Sioson that was dated in July 2008. 

The VA examiner did not provide an assessment, impression, or diagnosis. He said that the Veteran was taking prednisone for the PMR and neuropathy and that the Veteran saw a hematologist and rheumatologist. 

The Veteran was afforded a VA examination in April 2009; however, his claims file was not provided. The examiner noted that she was able to review clinic notes from Dr. Aelion for the period from May 2008 to January 2009. They were provided by the Veteran. Allegedly, Dr. Aelion declared the Veteran to be in remission for his PMR as of January 2009. The examiner provided a diagnosis of PMR. She also said that, in most patients, steroid treated PMR was a self-limiting illness lasting 1-2 years. She listed muscle weakness and joint pain as associated with the diagnosis. In regard to neuropathy, she related evidence of paresthesias of the left foot along the bottom and later edge. This was described as intermittent with certain positions. 

In 2010, the examiner was asked to provide an opinion as to whether the Veteran's claimed PMR and neuropathies were related to his military service, particularly toxin exposure. The examiner responded in October 2010 that her opinion in regard to PMR was the same. She said PMR can be a self-limiting disease. She said that, without a new examination or at least a review of current treatment records from the Veteran's private physician, it was impossible to know the current stage of the disease. In regard to the claimed peripheral neuropathy, the examiner said that she found no evidence of it on her earlier examination. The Veteran had undergone back surgery shortly before her examination, and she did not include a back examination in her review. She said that the Veteran did not mention having a diagnosis of peripheral neuropathy and that her examination did not support such a finding. The only abnormality she found was that involving the left foot, and she attributed that as a residual from the back surgery. She said that, based on the evidence she had it could not be said that peripheral neuropathy existed for any of the four extremities in April 2009.

The Board notes that the Veteran submitted a statement from Dr. Guthrie in September 2009. The statement indicated that he had reviewed the VA decision and the Veteran's medical records and concluded that it was at least as likely as not that the Veteran's current condition of PMR and neuropathy was due to his military service. Dr. Guthrie did not provide any explanation or rationale for this opinion. He went on to say "...which includes the conditions of symptoms such as chronic fatigue syndrome, fibromyalgia and neuropathy." 

As noted in the Introduction, Dr. Guthrie provided a second statement received in May 2012. Dr. Guthrie noted that the Veteran was diagnosed with PMR by Dr. Aelion in May 2008. He said the Veteran's illness had some characteristics of PMR with shoulder pain and an increased sedentary rate but his age and constitution of symptoms suggested something else and was still somewhat of a mystery. He said the Veteran experienced problems with fatigue, numbness of hands and "anarthralgias" [sic] and insomnia. The symptoms had improved but were present. He said he believed that the Veteran's symptoms were chronic and a result of an illness of unknown origin. Ultimately, he related the Veteran's symptoms to what he described as "Gulf War Syndrome" that was the result of the Veteran's military service. 

As noted, the evidence of record documents diagnostic and clinical evaluations of the Veteran's symptoms by physicians other than Dr. Guthrie. These include Dr. Siosin and Dr. Aelion. In addition, the Veteran's journal describes further evaluations and hospitalization. The Veteran has not provided the records associated with this other treatment or authorized VA to obtain them. He has made certain records available to the VA examiner in April 2009, as well as at the time of his Gulf War examination in September 2008, without making the records a part of the claims file. The claims file must contain the records relied on by a VA examiner. 

On remand, the Veteran must be asked to provide the treatment records from the sources identified, as well as any other pertinent medical records. Moreover, the latest clinical evidence in the claims file is that from Dr. Guthrie and it is dated in July 2008-only a month after the claim was filed. Current treatment records must also be requested. In this regard, the Board points out that the Veteran has a duty to assist in the development of his claim. See Woods v. Derwinski, 1 Vet. App. 190, 193 (1991) (noting that "[t]he duty to assist is not always a one-way street"); see also 38 C.F.R. § 3.159 (c)(1)(i), (ii) (2011). VA's duty must be understood as a duty to assist the Veteran in developing his claim, rather than a duty on the part of VA to develop the entire claim with the Veteran performing a passive role. Turk v. Peake, 21 Vet. App. 565, 568 (2008) (citing to Woods, 1 Vet. App. at 193). 

Accordingly, the case is REMANDED for the following action:

1. The RO should contact the Veteran and request that he identify the names, addresses, and approximate dates of treatment for all VA and non-VA health care providers who have treated him for his claimed disorders. The RO should attempt to obtain copies of pertinent treatment records identified by the Veteran that have not been previously secured and associate them with the claims file. 

Such a request should include, but is not limited to, complete records from Dr. Siosin and Dr. Aelion, results of any EMG testing from Dr. Curwen, as well as any records from Dr. Guthrie dated after July 2008. 

2. Only upon completion of the above development the Veteran should be afforded a VA examination, or examinations if required, by a physician with appropriate expertise to determine the nature, extent, and etiology of any currently present fatigue, multi-joint pain, muscular weakness, or neurological impairment such as neuropathy. All indicated studies should be performed. The claims file must be provided to the examiner for review as part of the examination.

The examiner is advised that the Veteran has alleged that he suffers from the above symptoms as a result of an undiagnosed illness related to his service in Southwest Asia in 1991. The Veteran has been diagnosed with, and treated for, PMR. His treating physician, Dr. Guthrie has also raised the possibility of the Veteran's fatigue symptoms being related to chronic fatigue syndrome and his multi-joint pain could be related to fibromyalgia. Any medical evidence reviewed in conjunction with the examination must either be included in the claims file or in Virtual VA. 

A. For any clinical diagnoses associated with the Veteran's claimed symptoms of fatigue, multi-joint pain, muscular weakness, or neurological impairment such as neuropathy, the examiner should provide an opinion as to whether it is at least as likely as not that any such diagnosed disorder originated during the Veteran's active military service or is otherwise etiologically related to service-to include in-service exposure to smoke from oil fires and receipt of Anthrax vaccinations. 

B. If such diagnoses cannot be rendered, the examiner should nevertheless identify all signs and symptoms of any currently present fatigue, multi-joint pain, muscular weakness, or neurological impairment such as neuropathy, and include a discussion concerning the duration of the disorder and whether there are objective indications of chronic disability (i.e. clinical signs of illness or non-medical indicators of illness capable of independent verification that indicate the existence of chronic disability that cannot be diagnosed). 

All opinions expressed must be supported by a complete explanation as to why the examiner arrived at the opinion. If the examiner determines that he/she cannot provide an opinion without resorting to speculation, the examiner should explain the inability to provide an opinion, identifying precisely what facts could not be determined. In particular, he/she should comment on whether an opinion could not be provided because the limits of medical knowledge have been exhausted or whether additional testing or information could be obtained that would lead to a conclusive opinion. (The AOJ should ensure that any additional evidentiary development suggested by the examiner be undertaken so that a definite opinion can be obtained.)

3. Review the examination report to its complete compliance with the directives of this Remand. If the report is deficient in any manner, it should be returned to the examiner. Failure to ensure the adequacy of the examination report may result in another remand. Stegall v. West, 11 Vet. App. 268 (1998). 

4. After undertaking any other development deemed appropriate the RO should re-adjudicate the issues on appeal. If any benefit sought is not granted, the Veteran and his attorney should be furnished with an SSOC. The SSOC must include the applicable version of 38 C.F.R. § 3.317 in effect at the time of receipt of the claim as well as the amended version effective from September 2010 and August 2011. The Veteran should be afforded an opportunity to respond before the record is returned to the Board for further review.

No action is required of the Veteran until he is notified by the originating agency; however, the Veteran is advised that failure to report for any scheduled examination may result in the denial of his claims. 38 C.F.R. § 3.655 (2011). The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999). 

This case must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the United States Court of Appeals for Veterans Claims (Court) for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2011).



_________________________________________________
THERESA M. CATINO
Veterans Law Judge, Board of Veterans' Appeals

Under 38 U.S.C.A. § 7252 (West 2002), only a decision of the Board is appealable to the Court. This remand is in the nature of a preliminary order and does not constitute a decision of the Board on the merits of your appeal. 38 C.F.R. § 20.1100(b) (2011).